A.L. AND B.L., PLAINTIFFS-APPELLANTS, v. P.A. AND M.A.,
DEFENDANTS-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Submitted October 1, 1986—Decided October 30, 1986.

392

Before Judges DREIER, SHEBELL and STERN.

*LaFianza and Strull,* attorneys for appellants (*Linda F. Spiegel,* of counsel and on the brief).

*Maycher and Molinelli* attorneys for respondents (*John L. Molinelli,* of counsel and on the brief).

The opinion of the court was delivered by

DREIER, J.A.D.

Plaintiffs A.L. and B.L.[1] have appealed from a summary judgment entered by Judge Cassidy in the Law Division. He dismissed their complaint for out-of-pocket expenses and consequential damages arising from the alleged breach by defendants P.A. and M.A. of a contract to permit plaintiffs to adopt defendants' infant son.

The child was born to M.A. when she was 20 years old and P.A. was 19. They were unmarried and living separately. M.A. lived with her parents who helped care for the infant, and P.A. visited regularly. The situation continued for the first nine to ten months of the child's life. When her parents informed her that they would be traveling after her father's retirement in a few months, M.A. became concerned about being able to care for her child properly. She then discussed the matter at length with her baby-sitter and indicated that she was contemplating placing her son in a foster home preparatory to offering him for adoption. Based upon her fondness and trust for the baby-sitter, M.A. agreed to give the sitter temporary custody while she made up her mind concerning the adoption. This was accomplished, again with no compensation, for a period of approximately six weeks. During this period the baby-sitter learned that her cousins, plaintiffs A.L. and B.L., were interested in adopting a child and the natural mother

---

[1] Although no order of confidentiality has heretofore been entered in these proceedings, and considering that this opinion will be published, we have determined to implement the suggestion contained in the administrative Monthly Bulletin Letter of March 1, 1978 and employ "nonidentifying initials" in this adoption matter.

was so informed. Although the testimony diverged slightly as to the events of the next month, it is clear that with the sitter merely passing messages between them, the parties were brought together on several occasions to exchange information and discuss the adoption.[2] At these meetings plaintiffs expressed their desire to adopt the child, explaining that they were unsuccessful in prior attempts to adopt through adoption agencies. Plaintiffs' claim that defendants gave them repeated assurances that they had given adequate consideration to their decision and were completely satisfied with it. They thereupon gave custody of their son, then 10 months old to plaintiffs.

Plaintiffs filed their complaint for adoption soon after receiving the baby. Defendants were duly served with a notice of the hearing accompanied by an affidavit of no contest for them to sign. They waited nearly six weeks and then signed and returned the affidavit. Approximately one week later the Children's Aid and Adoption Society prepared its report for the court after meeting with both the natural mother and the prospective adopting parents. (The father was unavailable because of his work schedule). The mother told the social worker that she and P.A. had consented to the adoption because under the circumstances they could not provide their child with proper security and stability. The social worker concluded that plaintiffs were financially and emotionally capable of being parents to the child.

Ten days after they signed their affidavits of consent the natural parents retracted their consent to the adoption and

---

[2]Although plaintiffs have also claimed that the sitter acted improperly, and, in fact, violated *N.J.S.A.* 9:3–39, Judge Cassidy specifically found to the contrary. The baby-sitter acted without remuneration and had little to do with the placement of the child, leaving it to the parties to make their own face-to-face decisions. The trial judge implicitly found that she did not "materially assist in the placement" of the child, a finding required for a violation of the Act. *Compare In re Adoption of Child by N.P. and F.P.*, 165 *N.J.Super.* 591, 595–96 (Law Div.1979). An appraisal of her conduct, however, is not before us.

commenced unspecified "legal proceedings" for the return of their child. They were married soon thereafter.

Plaintiffs continued to pursue their adoption action for the next three months; but then and with some obvious discomfort and reluctance, they withdrew their adoption action, relinquished their efforts to adopt the child, and returned him to the custody of his natural parents with whom he has remained. Three months later they filed this action for damages for breach of contract. They alleged that B.L. had left her job of seven years in order to devote herself full-time to the care of the child. In addition to this lost income, plaintiffs also assert that they incurred expenses for food, clothing and medical care for the child and suffered emotional distress resulting from defendants' breach of the alleged contract. Judge Cassidy in a nine-page formal opinion concluded:

> No New Jersey decision has been brought to the attention of the Court which would allow damages to be awarded in this instance. Additionally, nowhere in the extensive statutory language dealing with adoptions and parental rights, N.J.S.A. 9:3–37 *et seq.* had the legislature expressly created a cause of action for damages in this situation.

Based upon this finding, Judge Cassidy granted defendants' motion for summary judgment. We agree and affirm. Since, however, this is a case of first impression, an expansion of our reasons is necessary.

Plaintiffs argue that there was a valid contract for adoption and that defendants' revocation of consent and demand for the return of the child constituted a breach of that contract. Alternatively, they would have us find them entitled to recover under the doctrine of promissory estoppel, at least as to the sums expended for the support and care of the child in reliance upon their reasonable anticipation that the child would be theirs. Lastly, they contend that there is statutory authority for their claim.

 Judge Cassidy correctly applied statutory law, rather than common law contract principles. Although the roots for the practice of adoption are found deep in religious tradition and even ancient Greek and Roman law, there is no right to

adoption at common law; any right to adopt a child is by operation of statute. *In re Coe,* 42 *N.J.* 485, 489–90 (1964); *In re Adoption of P,* 193 *N.J.Super.* 33, 36 (Law Div.1983). A bargained-for exchange through an improper intermediary with respect to the life of a child is repugnant and illegal; even permitted private placements are strictly circumscribed by statute. *N.J. S.A.* 9:3–39. Wherever possible and in keeping with the best interests of the child, the public policy of this State favors the maintenance of the natural parents' relationship with the child.[3]

The Legislature has distinguished private placements from other types of adoptions. The Legislature recognized the inherent dangers in a "black market" or "gray market" adoption where the intermediary is not a statutorily approved agency. *N.J.S.A.* 9:3–39 provides for criminal sanctions to be imposed upon unauthorized intermediaries. The contrast in the different treatment given to agency adoptions and even legitimate private placements is further highlighted by comparing other statutory provisions governing the termination of natural parents' rights. Under *N.J.S.A.* 9:3–41, a parent's surrender of a child to an approved agency is "valid and binding" and constitutes "relinquishment of such person's parental rights ... in the child ... and consent by such person to adoption of the child." In a private, non-agency placement, however, a natural parent may under *N.J.S.A.* 9:3–46a object to the adoption of his or her child at any time prior to the entry of judgment of adoption, even if the parent has given up custody. *N.J.S.A.* 9:3–46a provides:

Any parent who has not executed a surrender [to an approved agency] and whose parental rights have not been terminated by court order shall have the

---

[3]We stress that this case does not involve a custody question between the two natural parents where the rights of one might be cut off in favor of the adopting spouse of the other natural parent. In such a case a court must consider whether, as in most but not all custody and adoption matters, the paramount concern must be for the best interests of the child. *Compare Mastropole v. Mastropole,* 181 *N.J.Super.* 130, 136 (App.Div.1981), and *N.J.S.A.* 9:3–37; *with N.J.S.A.* 9:3–46a and 9:3–48c(1), and *In the matter of Adoption by J.J.P.,* 175 *N.J.Super.* 420, 428 (App.Div.1980).

> right to object to the adoption of his child. No judgment of adoption shall be entered over an objection of such parent communicated to the court by personal appearance or by letter unless the court finds that such parent has substantially failed to perform the regular and expected parental functions of care and support of the child, which shall include maintenance of an emotional relationship with the child.

*See also N.J.S.A.* 9:3–48c(1). In this private placement, defendants' consent and surrender did not extinguish their rights. In *Sees v. Baber,* 74 *N.J.* 201, 213 (1977), decided under an earlier Adoption Act with similar principles, the court stated that "neither consent nor voluntary surrender [of the child] is singled out as a statutory factor in terminating parental rights in an unregulated private placement...."

> Consent ... may be fixed as a statutory brace for terminating parental rights only in voluntary agency placements. But in an unsupervised private placement, since there is no statutory obligation to consent, there can be no legal barrier to its retraction. [*Id.* at 215].

 We determine that the natural parents cannot be responsible for civil damages for their revocation of consent or opposition to the entry of the adoption order. Such an economic disincentive would have an improper chilling effect upon their exercise of their right to continue the parent-child relationship. Prior to final adjudication by a court terminating parental rights or a binding decision indicated by placement with an approved agency, there can be no expectation on the part of the adopting parents that the legally tentative decision to place the child for adoption will not be revoked. All investment of time, money and emotion by them must be understood against that legal principle. Simply stated, defendants' conduct violated no rights of plaintiffs. Defendants engaged in no malicious conduct and clearly lacked an intent to bring harm upon plaintiffs. They merely sought the return of their child.

 Plaintiffs have additionally claimed that their right of reimbursement can be founded upon the Adoption Act itself. *N.J.S.A.* 9:3–37. This section provides that the Act must be liberally construed to promote the best interests of children and "[d]ue regard shall be given to the rights of all persons affected by an adoption." There were no "rights" of the putative

adoptive parents which were violated; they had no "right" to the child pending final adjudication.

■ Plaintiffs lastly claim that *N.J.S.A.* 9:17–55, requiring a father to support his child, authorizes their claim for reimbursement of expenses they advanced on behalf of the baby while in their care. This statute is not an adoption statute, but rather a section of the New Jersey Parentage Act, *N.J.S.A.* 9:17–38 *et seq.* To require reimbursement in the situation before us under the statute, or even on a *quantum meruit* basis, would place a premium upon the exercise of what we had deemed to be a fundamental protected right of the natural parents. In situations such as the one before us the natural parents are often people of limited means and should not be subjected to subsequent litigation for an mistake in judgment in initially consenting to an adoption at a time of financial, family or social despair. While the father may have been relieved from some measure of support during the time the child was placed with plaintiffs, their expenses and justifiable mental anguish must go without recovery in light of the greater public policy favoring the right of natural parents to withdraw their consent in a timely manner.

Affirmed.